# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 15-cr-117(1) (JRT/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Michael Edwin Pearson, | |
| Defendant. | |

Carol M. Kayser, Assistant United States Attorney, United States Attorney's Office, 316 North Robert Street, Suite 404, St. Paul, MN 55101 (for the Government); and

Robert W. Owens, Jr., Owens Law, L.L.C., 5270 West Eighty-Fourth Street, Suite 300, Bloomington, MN 55437 (for Defendant).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 34); Motion to Suppress Statements, Admissions and Answers[1] (ECF No. 36); Motion to Sever Counts (ECF No. 37); and Motion to Dismiss Counts 1-5 (ECF No. 39). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

---

[1] At the hearing, the Court asked defense counsel about the motion's reference to an "attached Memorandum." (Mot. to Suppress Stmts. at 1; Tr. 17-18, ECF No. 49.)  Defense counsel confirmed that the language was included in error and that he would be filing a memorandum in support of the motion following the hearing.  (Tr. 18.)

A hearing was held on June 19, 2015.  Assistant United States Attorney Carol M. Kayser appeared on behalf of the United States of America (the "Government").  Robert W. Owens, Jr., appeared on behalf of Defendant Michael Edwin Pearson.

The Court heard testimony from Officer Dale Hanson of the Minneapolis Police Department.  (Tr. 20.)  The Court also heard testimony from Defendant's stepfather.  (Tr. 58.)  The Government offered and the Court received: Exhibit 1, a search warrant application, search warrant, and return for Defendant's residence; Exhibit 2, a photograph of Defendant's residence; Ex. 3, an audio recording of Officer Hanson's interview with Defendant on February 5, 2015; Ex. 4, a transcript of the same interview; and Ex. 5, a February 5, 2015 investigation report prepared by Officer Hanson.

Post-hearing briefing is now complete and these motions are ripe for a determination by the Court.

## I.

Defendant has been charged with five counts of receipt of child pornography under 18 U.S.C. § 2252(a)(2) and one count of possession of child pornography under 18 U.S.C. § 2252(a)(4)(B).[2]  (Indictment at 1-7, ECF No. 12.)  Each of the six counts in the Indictment refers to conduct alleged to have occurred on a particular date and identifies specific images/files that do not overlap with any other count.  (Indictment at 1-7.)  Receipt carries a mandatory minimum sentence of 5 years whereas there is no mandatory minimum for possession.  *Compare* 18 U.S.C. § 2252(b)(1) ("imprisoned not less than 5 years and not more than 20 years") *with* (2) ("imprisoned not more than 10 years").

---

[2] The charges also encompass the respective sentencing provisions of 18 U.S.C. § 2252(b) based on Defendant's previous convictions.  (*See* Indictment at 1-7.)

Where a person has a relevant predicate conviction, the mandatory minimum sentence for receipt is 15 years versus 10 years for possession.  *Compare* 18 U.S.C. § 2252(b)(1) ("imprisoned for not less than 15 years nor more than 40 years") *with* (2) ("imprisoned for not less than 10 years nor more than 20 years"); *see United States v. Wheelock*, 772 F.3d 825, 830-32 (8th Cir. 2014) (discussing § 2252's mandatory minimums for possession and receipt).  Defendant moves for the dismissal of the receipt counts, Counts 1 through 5, arguing that because section 2252 does not define receipt or possession, a person who "downloads child pornography on his computer" does not know whether he will be charged with receipt or possession and therefore section 2252 "is void for vagueness and the rule of lenity requires Counts 1-5 be dismissed."  (Def.'s Mem. in Supp. of Mot. to Dismiss at 1-6, ECF No. 55; *see* Def.'s Mot. to Dismiss at 1 (seeking dismissal "on the grounds that the distinction between receipt of child pornography and possession of child pornography as charged is absurd, illogical, unsupportable and a violation of the basic rules of statutory construction, the Double Jeopardy Clause, and the Rule of Lenity.").)

"The Fifth Amendment guarantees every citizen the right to due process. Stemming from this guarantee is the concept that vague statutes are void." *United States v. Washam*, 312 F.3d 926, 929 (8th Cir. 2002) (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)); *accord United States v. Birbragher*, 603 F.3d 478, 484 (8th Cir. 2010).  "The void-for-vagueness doctrine protects persons by providing 'fair notice' of a statute's applicability and by preventing 'arbitrary and discriminatory prosecutions' of a statute's enforcement."  *United States v. Mabie*, 663 F.3d 322, 333 (8th Cir. 2011)

3

(quoting *Skilling v. United States*, 561 U.S. 358, 412 (2010)); *see Knutson v. Brewer*, 619 F.2d 747, 749 (8th Cir. 1980) ("People should not be branded as criminals or condemned to suffer grievous loss without fair notice that the legislature has in fact forbidden the conduct for which they are being punished.").

"'[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Washam*, 312 F.3d at 929 (alteration in original) (quoting *Connally*, 269 U.S. at 391); *accord Mabie*, 663 F.3d at 333; *Birbragher*, 603 F.3d at 484; *see Knutson*, 619 F.2d at 749 ("It is clear, of course, that an individual may not be punished for crime if, under the words of the statute, he had no reasonable expectation that his conduct would be unlawful."). "In other words, '[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" *Birbragher*, 603 F.3d at 484-85 (quoting *Washam*, 312 F.3d at 929); *accord Mabie*, 663 F.3d at 333. "To defeat a vagueness challenge, a penal statute must pass a two-part test: The statute must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement." *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009) (quotation omitted).[3]

---

[3] "While the void for vagueness doctrine is found on the Fifth Amendment guarantee of due process, a greater degree of statutory precision is generally required of laws that implicate the First Amendment." *United States v. Warsame*, No. 04-cr-29 (JRT), 537 F. Supp. 2d 1005, 1016 n. 7 (D. Minn. 2008); *see Washam*, 312 F.3d at 929 ("Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." (quotation omitted)). Defendant does not make any First Amendment arguments.

Defendant's argument is not that section 2252 fails to provide him with adequate notice that it is against the law to have child pornography.  Rather, Defendant's argument appears to focus on arbitrary enforcement.  (*See* Def.'s Mem. in Supp. of Mot. to Dismiss at 4.)  Defendant argues that the Government may arbitrarily determine whether to charge a person with possession or receipt based on the same act of downloading a child pornography image.  (Def.'s Mem. in Supp. of Mot. to Dismiss at 5-6.)  Defendant asserts that "it is logically impossible to possess child pornography without somehow receiving it," and, because section 2252 does not define possession or receipt, a person "download[ing] child pornography for viewing on his computer" does not know whether he will be charged with the crime of possession or receipt.  (Def.'s Mem. in Supp. of Mot. to Dismiss at 3-4.)  Defendant asserts that "the Government is unable to prove that [Defendant's] actions charged in [the receipt counts] were any different than his actions charged in [the possession count]. . . . The Government has simply chosen to charge five images from [Defendant's] computer as possession and 13 images from [Defendant's] computer as receipt."  (Def.'s Mem. in Supp. of Mot. to Dismiss at 6.)

The Eighth Circuit "has held that possession of child pornography is a lesser-included offense to receipt of child pornography."  *United States v. Manning*, 738 F.3d 937, 946 (8th Cir. 2014) (citing *United States v. Muhlenbruch*, 634 F.3d 987, 1002 (8th Cir. 2011)).  "[P]roof of receiving child pornography under § 2252(a)(2) necessarily includes proof of illegal possession of child pornography under § 2252(a)(4)(B)."  *Muhlenbruch*, 634 F.3d at 1003; *see United States v. Worthey*, 716 F.3d 1107, 1113 (8th Cir. 2013) ("'The convictions for receipt and possession of child pornography turn on

5

essentially the same requirements and evidence . . . .'" (quoting *United States v. White*, 506 F.3d 635, 641 (8th Cir. 2007)).

The Eighth Circuit has also held that convictions for *both* possession and receipt of the *same* images violate the Double Jeopardy Clause because they are based on the same conduct and thus constitute "the 'same act or transaction'" under *Blockburger v. United States*. *Muhlenbruch*, 634 F.3d at 1004 (quoting 284 U.S. 299, 304 (1932)). As stated above, however, each count in the Indictment alleges conduct occurring on a different date and identifies particular images associated with that date. *See Hill*, 750 F.3d at 987 ("different facts and images for each count"); *Manning*, 738 F.3d at 946-47 ("indictment specified different facts and images for each charge").

 "[I]t is well settled that when conduct violates more than one criminal statute, the Government may choose which statute it will apply." *United States v. Derezinski*, 945 F.2d 1006, 1010 (8th Cir. 1991) (citing *United States v. Batchelder*, 442 U.S. 114, 124-25 (1979)); *accord United States v. Fletcher*, 322 F.3d 508, 519 (8th Cir. 2003). "Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *Batchelder*, 442 U.S. at 125; *accord Bauermeister v. Kor Xiong*, 440 Fed. App'x 521, 522 (8th Cir. 2011) (per curiam); *Parkhurst v. Tabor*, 569 F.3d 861, 867 (8th Cir. 2009). "Prosecutors have broad discretion when making charging decisions." *United States v. Kriens*, 270 F.3d 597, 602 (8th Cir. 2001); *accord United States v. Jacobs*, 4 F.3d 603, 604 (8th Cir. 1993) (per curiam); *see United States v. Guidant LLC*, 10-mj-67 (DWF), 708 F. Supp. 2d 903, 922 (D. Minn. 2010) ("The prosecution has wide discretion in determining what charges to

bring.  It must make such decisions after carefully considering the facts known at the time, the elements of a particular crime, and the uncertainty of results in any criminal proceeding.").

"In exercising this discretion, the prosecutor may take into account the penalties available upon conviction."  *Jacobs*, 4 F.3d at 604 (citing *Batchelder*, 442 U.S. at 125). "If a defendant's conduct is punishable under two or more statutes and the Government chooses the one providing a harsher penalty, the defendant cannot complain."  *United States v. Phillips*, 522 F.2d 388, 393 (8th Cir. 1975); *see Batchelder*, 442 U.S. at 125 ("Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced.").  That the alleged conduct constituting receipt of child pornography under § 2252(a)(2) in Counts 1 through 5 would also constitute possession of child pornography under § 2252(a)(4)(B) does not render the Government's decision to charge Defendant with receipt under § 2252(a)(2) and its accompanying increased penalties arbitrary.  *See Batchelder*, 442 U.S. at 125; *Kriens*, 270 F.3d at 602; *Jacobs*, 4 F.3d at 604.

Moreover, in addressing the different mandatory minimums for possession and receipt of child pornography under § 2252, the Eighth Circuit has stated that "the distinction [between possession and receipt] is not meaningless simply because knowing receipt and knowing possession overlap in the *usual* case."  *Wheelock*, 772 F.3d at 830; *see Muhlenbruch*, 634 F.3d at 1003 (proof of receipt necessarily includes proof of possession).  The Eighth Circuit observed that possession and receipt "each . . . threaten[]

7

distinct harms." *Wheelock*, 772 F.3d at 832. "Possession of child pornography, while heinous in its own right, does not necessarily spread the harm beyond the possessor himself, whereas 'receiving materials that have been shipped in interstate commerce is conduct more closely linked to the market for child pornography.'" *Id.* at 831 (quoting *United States v. Watzman*, 486 F.3d 1004, 1009 (7th Cir. 2007)). "This closer link to the market and its attendant harms is important because '[a] person who receives these images furthers the market *whether or not* the person retains them.'" *Id.* (alteration in original) (quoting *United States v. Sturm*, 673 F.3d 1274, 1279 (10th Cir. 2012) (internal quotation marks omitted)). "Possession alone, however, does not necessarily contribute to the market, and '[b]ecause the harms flowing from possession of child pornography differ from those associated with distribution and receipt, differentiating levels of punishment should not be unexpected.'" *Id.* (quoting *Sturm*, 673 F.3d at 1280). For example, an individual may unknowingly receive child pornography but then, upon discovery, knowingly continue to possess it. *Id.*; *see United States v. Benoit*, 713 F.3d 1, 15 (10th Cir. 2013) (amendment adding "knowingly possess" was intended as gap-filler to preexisting "knowingly receives").

In sum, the exercise of the Government's prosecutorial discretion to charge Defendant with five counts of receipt of child pornography rather than five counts of the lesser-included offense of possession does not render enforcement of § 2252 arbitrary,

and therefore § 2252 is not vague.[4]   Based on the foregoing, the Court recommends that

that Defendant's Motion to Dismiss Counts 1-5 (ECF No. 39) be denied.

## II.

The Court now turns to Defendant's motions to suppress.

### A. Findings

Based upon the file and documents contained therein, along with the testimony

and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### 1. Investigation

Officer Hanson is involved with the Internet Crimes Against Children ("ICAC")

task force and has been a part of the task force for approximately 10 years.  (Tr. 21, 22.)

Officer Hanson's responsibilities include investigating child pornography cases.  (Tr. 22.)

As part of the investigative process, Officer Hanson runs a special version of software

designed for law enforcement that accesses peer-to-peer file-sharing networks "searching

for and making contact with computers in Minnesota that have reported to that file-

sharing network that the computer is either downloading or fully possesses" a file known

to law enforcement to contain child pornography.  (Tr. 25; *see* Tr. 26-27.)

Between September and December 2014, Officer Hanson's computer made

contact with a computer in Minneapolis, identified by an Internet Protocol ("IP") address.

(Tr. 27.)  From the computer at this IP address, Officer Hanson was able to download

---

[4] As previously explained, Defendant does not contend that § 2252 fails to provide adequate notice as to the type of material prohibited and because the Court finds that § 2252 is not otherwise vague, the Court declines to address Defendant's argument for application of the rule of lenity.  *See United States v. Smith*, 756 F.3d 1070, 1075 (8th Cir. 2014) ("Grievous ambiguity or uncertainty necessary to invoke lenity requires more than the simple existence of some statutory ambiguity because most statutes are ambiguous to some degree." (quotation omitted)), *cert. denied*, 135 S. Ct. 948 (2015).

child pornography.  (Tr. 27; Ex. 1 at App. 1-7.)    Officer Hanson sent subpoenas to the Internet Service Provider and each was returned identifying the same subscriber and residential address.  (Tr. 27-28; Ex. 1 at App. 1-10.)  The subscriber was listed as residing in Minneapolis.  (Tr. 28; Ex. 1 at App. 1-10.)  During this time, Officer Hanson was able to download additional files from the same IP address.  (Tr. 29.)

Officer Hanson entered the Minneapolis address into the Minnesota Predatory Offender Database.  (Tr. 29, 30; Ex. 1 at App. 1-10.)  The database contains individuals convicted of sex offenses which require them to register with the State of Minnesota. (Tr. 29-30.)  The database identified Defendant as a convicted sex offender residing at the Minneapolis address.  (Tr. 30; Ex. 1 at App. 1-10.)  The database also indicated that Defendant had been convicted of first and second-degree criminal sexual conduct involving two preteen females in Florida.  (Tr. 31; Ex. 1 at App. 1-10.)  From additional records, Officer Hanson also learned that, in November 2014, Defendant had filed a police report concerning a theft from his vehicle at the Minneapolis address.  (Tr. 31; Ex. 1 at App. 1-10.)  Additionally, Officer Hanson learned that Defendant has a driver's license and has two vehicles registered to him as well as a trailer.  (Tr. 32.)  Officer Hanson also checked with Defendant's probation officer, who confirmed that Defendant resided at the Minneapolis address.  (Tr. 32.)

Officer Hanson subsequently obtained a warrant to search the Minneapolis address.  (Tr. 23, 32; Ex. 1.)  The search warrant application and affidavit described Officer Hanson's training and experience as a computer forensic examiner/investigator in investigating the exploitation of children on the Internet.  (Ex. 1 at App. 1-2-1-3.)  Based

on his training and experience, Officer Hanson described the ways in which collectors of child pornography use computers, related media, and the Internet to obtain, store, and share child pornography as well as communicate with other individuals also interested in child pornography.  (Ex. 1 at App. 1-3-1-4.)  Specifically, Officer Hanson described how peer-to-peer file sharing works and the various ways in which law enforcement searches such networks for child pornography.  (Ex. 1 at App. 1-4-1-7.)  Officer Hanson also described how the file sharer's IP address becomes known through the download process. (Ex. 1 at App. 1-6.)

Officer Hanson then recounted his investigation in this case and how he obtained certain files from a particular IP address.  (Ex. 1 at App. 1-7-1-8.)  Officer Hanson verbally described the contents of the files constituting child pornography.  (Ex. 1 at App. 1-7-1-8.)  Officer Hanson also described how his investigation determined that the same IP address had offered additional child pornography files by comparing those files against files known to law enforcement to contain or are suspected of containing child pornography.  (Ex. 1 at App. 1-8-1-9.)  Officer Hanson also verbally described the contents of these files.  (Ex. 1 at App. 1-8-1-9.)

Officer Hanson next described how three administrative subpoenas were served on the Internet Service Provider and all reported that the subscriber resided at the Minneapolis address.  (Ex. 1 at App. 1-10.)  Officer Hanson noted that driver's license records indicated that the subscriber resided at the Minneapolis address and property tax records listed the subscriber as the owner of the residence located at the Minneapolis address.  (Ex. 1 at App. 1-10.)  Officer Hanson then described how his search of the

Minnesota Predatory Offender Database identified Defendant as also residing at the Minneapolis address, Defendant's probation officer confirmed that he resided at the Minneapolis address, and law enforcement records showed Defendant reporting a theft from the Minneapolis address.  (Ex. 1 at App. 1-10.)

### 2.  Search & Interview

Along with several other officers, Officer Hanson executed the search warrant at the Minneapolis residence on February 5, 2015, shortly after 7:00 a.m.  (Tr. 23, 32, 34-35, 46.)  Officer Hanson testified that it was likely officers would have had their firearms drawn when they entered and initially searched the residence.  (Tr. 46.)  There were four people in the home, including Defendant.  (Tr. 33.)  Officer Hanson testified that it is "very possible" that the first officer that Defendant encountered had his gun drawn.  (Tr. 46-47.)  Officer Hanson was not the first officer to encounter Defendant, but met up with Defendant in the basement, in which there was a curtained area serving as Defendant's bedroom.  (Tr. 33, 47.)  Defendant was awake.  (Tr. 33.)  The officers gathered everyone into the living room on the main floor.  (Tr. 33-34; *see* Tr. 47.)  Although he walked "[a] little slower," Defendant ascended the stairs on his own.  (Tr. 34; *see* Tr. 44, 47.)

Officer Hanson introduced himself, stated he had a "computer-related search warrant," and explained that he would like to interview everyone individually.  (Tr. 34; *see* Tr. 47.)  At this point, the officers' firearms were holstered.  (Tr. 35.)  Officer Hanson was wearing a black vest that identified him as a police officer.  (Tr. 35.)

After allowing Defendant to use the restroom, Officer Hanson spoke with Defendant in a bedroom on the main floor.  (Tr. 35, 36.)  Defendant sat on the side of the

bed and Officer Hanson stood at the foot of the bed.  (Tr. 36.)  There was no else in the room.  (Tr. 39.)  Defendant was not handcuffed or restrained in any way.  (Tr. 36-37, 40; *see* Tr. 44.)  The door to the bedroom was partially open.  (Tr. 39.)

Officer Hanson proceeded to interview Defendant.  (*See* Tr. 37; Exs. 3, 4.)  Officer Hanson made an audio recording of the interview.  (Tr. 37; Ex. 3.)  Approximately ten minutes into the interview, the recording abruptly ends.  (Ex. 3.)  Officer Hanson testified that he was using a new digital recorder that day and he inadvertently hit a button during the interview, causing the recorder to stop recording.  (Tr. 42, 43.)  Officer Hanson did not discover that the recorder had stopped until he was back in his office.  (Tr. 43; *see* Tr. 51.)   Officer Hanson testified that he believed he talked with Defendant for approximately five minutes more than the recording demonstrates.  (Tr. 42.)

Neither Officer Hanson nor anyone else promised anything to Defendant or threatened him in exchange for the interview.  (Tr. 39-40; *see* Tr. 44.)  Officer Hanson's firearm was holstered during the interview.  (Tr. 40; *see* Tr. 44.)  Officer Hanson testified that Defendant did not appear to be under the influence of drugs or alcohol at the time of the interview.  (Tr. 39.)  Officer Hanson testified that Defendant seemed "fairly relaxed," appeared to understand Officer Hanson's questions and statements, and was oriented to time and place.  (Tr. 40.)  Officer Hanson testified that Defendant's responses were "[s]ometimes a little slow . . . ," but otherwise answered his questions.  (Tr. 40.)  Indeed, the audio recording contains some longer pauses by Defendant before answering Officer Hanson's questions and, at times, it appears that Defendant is struggling to find the right words to express himself.  (*See* Ex. 3.)

13

At the beginning of the interview, Officer Hanson informed Defendant that he was not under arrest.  (Ex. 3; Ex. 4 at 1.)  Defendant responded that he would be.  (Ex. 3, Ex. 4 at 1; *see* Ex. 3, Ex. 4 at 2.)  Officer Hanson again stated that Defendant was "not under arrest right now," but that he could be arrested in the future depending on what was found as a result of the search.  (Ex. 3; Ex. 4 at 1.)  Officer Hanson then asked Defendant if Defendant believed that Officer Hanson would let him walk out of the house right now if he wanted to.  (Ex. 3; Ex. 4 at 1.)  Defendant indicated that he did not believe he would be allowed to do so.  (Ex. 3; *see* Ex. 4 at 1.)

Officer Hanson then told Defendant that, given Defendant did not believe he was free to leave, Officer Hanson wanted to make sure Defendant understood what his *Miranda* rights were.  (Ex. 3; Ex. 4 at 1-2.)  Defendant stated that he knew what his rights were.  (Ex. 3; Ex. 4 at 2; *see* Tr. 41.)  Officer Hanson stated that he was going to read Defendant his rights anyway.  (Ex. 3; Ex. 4 at 2.)  Officer Hanson testified that, even when people tell him that they know their rights, he reads them anyway "to make sure they know every single right."  (Tr. 41.)

Officer Hanson proceeded to read Defendant his *Miranda* rights.  (Ex. 3; Ex. 4 at 2.)  While Officer Hanson informed Defendant of his right to remain silent and to have an attorney present, Officer Hanson did not explicitly ask if Defendant wished to waive his right to remain silent or if Defendant wanted an attorney.  (Tr. 50; *see* Ex. 3, Ex. 4 at 2.)  After Officer Hanson read Defendant his rights, Defendant indicated that he understood those rights.  (Ex. 3; Ex. 4 at 2.)  Officer Hanson asked Defendant if he was under the influence of drugs or alcohol, and Defendant responded that he was taking medication for

a stroke he had approximately eight years before.  (Ex. 3; Ex. 4 at 2, 8.)  Officer Hanson

again asked if Defendant understood his rights, and Defendant indicated that he did.  (Ex.

3; Ex. 4 at 2.)

Defendant indicated that he was the one downloading child pornography and that

he knew it was illegal to download these materials.  (Ex. 3; Ex. 4 at 3, 6.)  Officer Hanson

provided Defendant with a copy of his investigative report during the interview, listing

some of the files that had been downloaded.  (Ex. 3; Ex. 4 at 3; Ex. 5; T. 44-45.)  During

the interview, Defendant often gave one word responses to Officer Hanson's questions,

but there were also times at which he gave lengthier responses and corrected Officer

Hanson.  (*See* Ex. 3; Ex. 4; *see also* Tr. 49, 57.)  At no point during the interview did

Defendant ask for an attorney.  (Tr. 42, 44.)

Throughout the interview, Officer Hanson learned more about Defendant's

stroke.[5]  (Tr. 41; *see* Ex. 3; Ex. 4 at 6, 8.)  Defendant's stroke affected the right side of his

body.  (Ex. 3; Ex. 4 at 6; *see* Tr. 41.)  Defendant stated he completed his course of

therapy and no longer attends.  (Ex. 3; Ex. 4 at 8.)  Defendant indicated that he is able to

walk around, but talking can be difficult for him.  (Ex. 3; Ex. 4 at 8; *see* Tr. 42.)  Officer

Hanson observed that Defendant's speech appeared to be affected; he spoke at a slower

pace; and he had trouble getting his words out.  (Tr. 49.)

After the interview, Defendant asked to retrieve his shoes from the basement.  (Tr.

42-43.)  Defendant and Officer Hanson walked downstairs to get Defendant's shoes.  (Tr.

---

[5] While Defendant stated that he had a single stroke, it appears that he had a series of three strokes during a short
period.  (*Compare* Ex. 3; Ex. 4 at 2, 8, *with* Tr. 48, 58-59.)  The Court refers to these strokes collectively.

43-44.)  While they were in the basement, Defendant "told [Officer Hanson] where the child pornography was located" in his bedroom.  (Tr. 43; *see* Tr. 51, 52.)

### 3.  Effect of Defendant's Stroke

At the hearing, Defendant's stepfather testified about the effects the stroke had on Defendant.  (*See* Tr. 58-67.)  Defendant's stepfather testified that he has known Defendant for nearly 50 years.  (Tr. 58, 62.)  Defendant's stepfather testified that he has regular contact with Defendant and sees Defendant about three times per month and on holidays.  (Tr. 58, 65.)

Defendant's stepfather testified that Defendant had a stroke in 2007 and spent approximately one week in the hospital.  (Tr. 59; *see* Tr. 64.)  Defendant's stepfather visited him in the hospital and helped with Defendant's therapy afterwards.  (Tr. 59; *see* Tr. 64.)  The stroke affected Defendant's speech, memory, ability to walk, and sense of taste and smell.  (Tr. 60, 61.)  Defendant also has difficulty writing.  (Tr. 60.)  Defendant's stepfather testified that he knew Defendant played games "a lot" on the computer and that he was not aware of any difficulties Defendant had using a computer.  (Tr. 63.)

With respect to Defendant's speech, Defendant's stepfather testified that Defendant gets frustrated trying to explain things or respond to questions "because he can't get the words out."  (Tr. 60; *see* Tr. 65, 67.)  This causes Defendant to become anxious.  (Tr. 60.)  In response, Defendant will "try to come up with a substitute word that he's trying to say" or just provide a one-word answer "to avoid answering the question any further or to say what he's trying to say."  (Tr. 60-61.)  Defendant also loses

his place in conversations and has difficulty understanding long sentences and fast speech.  (Tr. 61; *see* Tr. 65, 67.)

### B.  Conclusions of Law

Based upon the foregoing Findings, the undersigned makes the following conclusions of law.

#### 1.  Suppression of Evidence

Defendant has filed a boilerplate motion to suppress evidence.  (*See* Mot. to Suppress Evid.)  Defense counsel described the motion as much at the hearing.  (Tr. 11 ("Your Honor, I – it is a boilerplate motion.").)  At the hearing, the Government asked defense counsel to articulate the basis of the motion.  (Tr. 11.)  Defense counsel stated that, "to be frank, [he] cannot articulate the specifics of that motion."  (Tr. 12.)  Defense counsel also stated that he "would just inquire regarding probable cause to obtain the search warrant."  (Tr. 13.)  The Government requested that, when filing his supporting memorandum after the hearing, defense counsel articulate the basis for his challenge.  (Tr. 13.)  The Court noted that the Government's request was "fair," (Tr. 13), and informed defense counsel that the specific basis of the motion had not been articulated and defense counsel would "have to specifically identify what issue [is being] challeng[ed], or, in the alternative, withdraw that motion at that time," (Tr. 14).  Following the hearing, defense counsel filed a letter stating that he would not be filing a memorandum in support of the motion to suppress evidence.  (Ltr., July 22, 2015, ECF No. 57.)

"Federal Rules of Criminal Procedure 12(b)(3)(C) and (3) provides that motions to suppress evidence must be raised before trial or are waived, and the waiver provision 'applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion.'" *United States v. Reynolds*, 720 F.3d 665, 673 (8th Cir. 2013) (quoting *United States v. Spotted Elk*, 548 F.3d 641, 656 (8th Cir. 2008)). "At minimum, it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed." *United States v. Rosetter*, No. 10-cr-83 (JNE/JSM), 2010 WL 5184991, at *23 (D. Minn. Oct. 1, 2010), *adopting report and recommendation*, 2010 WL 5173155, (D. Minn. Dec. 13, 2010); *accord United States v. Edwards*, 563 F. Supp. 2d 977, 994 (D. Minn. 2008) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed."); *see United States v. Starks*, No. 99-cr-353 (RHK/JMM), 193 F.R.D. 624, 628 (D. Minn. 2000) ("It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing."). "[E]ven in those circumstances where the Government has the ultimate burden of persuasion, Defendant has the initial burden of making a prima facie showing of illegality." *Starks*, 193 F.R.D. at 628; *accord United States v. Torres*, No. 10-cr-0339(8) (PJS/JJK), 2011 WL 3035215, at *2 (D. Minn. July 7, 2011), *adopting report and recommendation*, 2011 WL 3035213 (D. Minn. July 25, 2011); *Rosetter*, 2010 WL 5184991, at *23; *Edwards*, 563 F. Supp. 2d at 994. "Failure to provide the Court with any support for the motion is a sufficient basis for denial of the

motion." *Rosetter*, 2010 WL 5184991, at \*23; *accord Torres*, 2011 WL 3035215, at \*2. Thus, Defendant's failure to specify the basis for his suppression motion and provide any argument in support thereof warrants denial alone.

In any event, the Court concludes that the search warrant was supported by probable cause. "To be valid under the Fourth Amendment, a search warrant must be supported by a showing of probable cause. Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Stults*, 575 F.3d 834, 843 (8th Cir. 2009) (quotation and citation omitted); *accord United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010) ("An affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." (quotation omitted)). "Whether a search warrant is supported by probable cause is determined by the totality of the circumstances; resolution of the question by an issuing judge should be paid great deference by reviewing courts." *Stults*, 575 F.3d at 843 (quotation omitted); *accord Mutschelknaus*, 592 F.3d at 828 (same). "As a general matter, an issuing court does not need to look at the images described in the affidavit in order to determine whether there is probable cause to believe they constitute child pornography. A detailed verbal description is sufficient." *Mutschelknaus*, 592 F.3d at 828-29 (quotation omitted).

Here, the search warrant application and affidavit described how individuals use computers and the Internet to obtain, share, and store child pornography and, more specifically, how peer-to-peer file-sharing networks are used to obtain and share child

pornography.   The search warrant application and affidavit chronicled Officer Hanson's training and experience in investigating the exploitation of children over the Internet and how law enforcement identifies known and suspected child pornography files on peer-to-peer file-sharing networks.   The search warrant and application then described how Officer Hanson was able to download a number of child pornography files from a particular IP address, which he traced to the Minneapolis address.   Considering the totality of the circumstances, the information contained in the search warrant application and affidavit created a fair probability that contraband would be found on computers at the Minneapolis address and, therefore, the search warrant was supported by probable cause.  *See Mutschelknaus*, 592 F.3d at 829; *Stults*, 575 F.3d at 843-44.

Accordingly,   the   Court   recommends   that   Defendant's   Motion   to   Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 34) be denied.

### 2.  Suppression of Statements

Defendant argues that he did not knowingly and intelligently waive his *Miranda* rights by speaking with Officer Hanson based on the totality of the circumstances, including Officer Hanson's failure to explicitly ask him whether he waived his rights and the effects of his stroke on his ability to comprehend and communicate.  (Def.'s Mem. in Supp. of Mot. to Suppress Stmts. at 2-3, ECF No. 56.)

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish the accused 'in fact knowingly and voluntarily waived *[Miranda]* rights'

when making the statement."[6]  *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (alternation in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *accord United States v. Iceman*, 13-cr-274 (MJD/LIB), 2014 WL 702014, at *2 (D. Minn. Feb. 24, 2014); *United States v. Ravensborg*, No. 13-cr-194 (MJD/LIB), 2013 WL 5565891, at *5 (D. Minn. Oct. 8, 2013).

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Berghuis*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *accord United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011).  Courts consider the totality of the circumstances in determining whether a waiver is valid and the Government bears the burden of proving validity by a preponderance of the evidence.

---

[6] "*Miranda* requires that law enforcement agents provide certain prescribed warnings before conducting an interrogation of a suspect who is in custody." *United States v. Lowen*, 647 F.3d 863, 866 (8th Cir. 2011) (quotation omitted).  "The Supreme Court in *Miranda* stated that warnings are required when interrogation is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (quotation omitted).  "The question 'whether a suspect is in custody is an objective inquiry.'" *Id.* (quoting *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011)) (internal quotation marks omitted).

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave or in this case, to terminate the interrogation and cause the officers to leave.

*Id.* at 867 (quotation and citation omitted).  "[T]he court must apply an *objective* test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id.* (emphasis added) (quotation omitted).  Both the Government and Defendant have assumed that circumstances were such that Defendant should be deemed to have been in custody at the time he spoke with Officer Hanson and therefore the Court has assumed the same. *But see United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) ("But *Miranda* applies only when the circumstances approximate a formal arrest, and execution of a search warrant is not an arrest.  Police inevitably 'dominate' the atmosphere in some sense while they are conducting a search.  But a reasonable resident who is unrestrained near the front door in the living room of his home, and who is advised that there is no arrest and that participation in any interview is voluntary, should know that he is free to leave or to terminate questioning.").

*Vinton*, 631 F.3d at 483; *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004); *accord Iceman*, 2014 WL 702014, at \*2-3; *United States v. Pape*, No. 12-cr-251 (PJS/LIB), 917 F. Supp. 2d 888, 895-96 (D. Minn. 2013); *see Berghuis*, 560 U.S. at 384.

Significantly, the government "does not need to show that a waiver of *Miranda* rights was express. An 'implicit waiver' of the right to remain silent' is sufficient to admit a suspect's statement into evidence." *Berghuis*, 560 U.S. at 384 (quoting *Butler*, 441 U.S. at 376)); *accord Iceman*, 2014 WL 702014, at \*3 ("Proper waiver may exist even absent express statements of waiver."); *Ravensborg*, 2013 WL 5565891, at \*5 (same). "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protections those rights afford." *Berghuis*, 560 U.S. at 385; *accord United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights."); *United States v. Soto*, No. 07-cr-0223 (PJS/JSM), 2007 WL 3120816, at \*13 (D. Minn. Oct. 23, 2007) ("[A] defendant's willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver."); *United States v. Mandujano*, No. 03-cr-178(2) (JRT/FLN), 2003 WL 22076577, at \*4 (D. Minn. Aug. 22, 2003) ("Waiver can be inferred by conduct, and a willingness to answer questions after acknowledging *Miranda* rights is sufficient to constitute an implied waiver."). "Where the [Government] shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain

22

silent." *Berghuis*, 560 U.S. at 384; *accord Iceman*, 2014 WL 702014, at *3; *Ravensborg*, 2013 WL 5565891, at *5; *see Soto*, 2007 WL 3120816, at *13 ("[A] *Miranda* waiver may be implied from the totality of the circumstances.").

The Government does not dispute that Defendant did not expressly waive his *Miranda* rights.  (*See* Gov't's Resp. at 10.)  "The Constitution, however, does not require that officers use a waiver form, or obtain an affirmative answer to a question such as, 'Do you waive these rights.'"  *Mandujano*, 2003 WL 22076577, at *4 (citing *Butler*, 441 U.S. at 373); *see Berghuis*, 560 U.S. at 385 (*Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights").  Accordingly, Officer Hanson was not required to elicit an express waiver from Defendant of his *Miranda* rights, and the Court turns to whether Defendant's waiver was voluntary, knowing, and intelligent.

Defendant does not directly argue that the waiver was involuntary.  (*See* Def.'s Mem. in Supp. of Mot. to Suppress Stmts. at 3-5.)  Defendant does, however, argue that "it is difficult to imagine [him] interrupting the armed interrogator to further inquire about or discuss the waiver of those rights he just acknowledged merely understanding." (Def.'s Mem. in Supp. of Mot. to Suppress Stmts. at 4.)  This argument could be interpreted as suggesting that an atmosphere of intimidation or coercion existed.  But, there is nothing in the record indicating that either Officer Hanson or any other officer at the scene threatened, intimidated, or coerced Defendant.  *See Vinton*, 631 F.3d at 483. The audio recording reveals that Officer Hanson was calm and patient with Defendant. Officer Hanson did not raise his voice or rush Defendant.  Even if Defendant could

23

establish that his stroke caused "a somewhat diminished capacity to resist coercion . . . , a *Miranda* waiver will not be invalidated on that basis if there is no evidence of police coercion." *Id.*; *see Smith v. Bowersox*, 311 F.3d 915, 922 (8th Cir. 2002) ("A defendant's mental condition cannot render his confession involuntary unless it coincides with improper conduct by police."); *Reese v. Delo*, 94 F.3d 1177, 1184 (8th Cir. 1996) ("In any event, some mental impairments alone do not render statements involuntary.").

It is not enough that the Government "establishes that a *Miranda* warning was given and the accused made an uncoerced statement . . . . The [Government] must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 384. "The determination of whether a defendant has knowingly and voluntarily waived his *Miranda* rights is an extremely fact sensitive inquiry. Circumstances to be considered include the background, experience, and conduct of the accused." *United States v. Nguyen*, 608 F.3d 368, 374 (8th Cir. 2010) (citation omitted); *see Vinton*, 631 F.3d at 483 (previous interactions with law enforcement to be considered in finding *Miranda* waiver was voluntary, knowing, and intelligent). Here, when Officer Hanson stated that he was going to inform Defendant of his *Miranda* rights, Defendant told Officer Hanson that he knew what his rights were. After Officer Hanson read Defendant his rights, Defendant twice confirmed that he understood what his rights were. Defendant was already familiar with the criminal justice system through his prior convictions in Florida. And, Defendant's awareness of his situation at the time he spoke with Officer Hanson is also apparent. As the Government points out, "[w]hen Officer Hanson explained to [Defendant] that he was conducting a child pornography investigation and that

24

[Defendant] was not under arrest, [Defendant] volunteered, 'I will be. I will be.'" (Gov't's Resp. Mem. at 15 (quoting Exs. 3 & 4), ECF No. 59.)   Defendant also acknowledged the import of the investigation on his probation, which he commented was almost over, and that he knew it was illegal to download child pornography.   While Defendant's stroke appears to have had a lasting impact on his speech and some of his physical abilities, the record shows that Defendant did understand what was occurring and the rights he was giving up by choosing to answer Officer Hanson's questions.

Defendant contends that *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998), is "strikingly similar to the instant case."  (Def.'s Mem. in Supp. of Mot. to Suppress Stmts. at 4.)  In *Garibay*, the defendant's primary language was Spanish, not English.  143 F.3d at 537.  When asked whether he understood English, the defendant said "yes" and law-enforcement agents proceeded to read him his rights in English.  *Id.* at 536.  Despite the availability of Spanish-speaking agents, the defendant was also questioned in English. *Id.* at 537. The interviewing agent admitted that "he had to rephrase questions when [the defendant] did not seem to comprehend what was said to him."  *Id.*  And while the defendant attended high school in the United States, other information in the record "clearly indicate[d] that . . . [the defendant] understands only a few things in English." *Id.*  The defendant's former high school counselor, former football coach, examining psychologist, and probation officer all testified that they spoke with the defendant in Spanish at his request.  *Id.* at 538.  The defendant's former football coach also testified that "when under stress and interacting with persons of authority, [the defendant] often claimed to understand English and gave the appearance of comprehending English, when

in fact he did not understand what was being said to him." *Id.*   Additionally, it was undisputed that the defendant had a low IQ, "borderline retarded."   *Id.* at 538, 538 n.7. Moreover, the defendant "had no previous experience with the criminal process."   *Id.* at 539.   Based on the totality of the circumstances, the Ninth Circuit concluded that the defendant did not knowingly and intelligently waive his *Miranda* rights.   *Id.* at 538, 539.

Defendant points to his stepfather's testimony that he (1) becomes frequently frustrated when unable to find the right words to express himself and resorts to one-word answers in order to end the conversation; (2) has difficulty comprehending "fast conversation and long sentences"; and (3) suffers from short-term memory loss.  (Def.'s Mem. in Supp. of Mot. to Suppress at 4.)   The Court is not persuaded that these circumstances are on par with those in *Gariby*.   First, Defendant's comprehension abilities are far greater than the defendant in *Gariby*.   There is no language barrier and, while Defendant's responses were slower and at times hesitant, those responses did not suggest that Defendant did not understand the questions asked by Officer Hanson.  The Court also finds credible Officer Hanson's testimony that Defendant was able to understand the questions posed and statements made.   Second, unlike the defendant in *Gariby*, Defendant was familiar with the criminal justice process based on his prior convictions and told Officer Hanson that he knew his rights even before they were read to him.   Third, there is no evidence indicating that Defendant is cognitively impaired.   In sum, *Gariby* is inapposite.

Based on the foregoing, the Court concludes that Defendant implicitly waived his *Miranda* rights by responding to Officer Hanson's questions after being informed of his

rights and that the waiver was voluntary, knowing, and intelligent.  Therefore, the Court recommends that Defendant's Motion to Suppress Statements, Admissions and Answers (ECF No. 36) be denied.

## III.

Lastly, Defendant has filed a boilerplate motion requesting an "order directing severance of counts."  (Mot. to Sever at 1.)  Defendant's motion does not specify which of the six counts in the Indictment he seeks to sever and provides five conclusory reasons for severance.  At the hearing, Defendant appeared to indicate that he would be seeking severance of the receipt counts (Counts 1 through 5) from the possession count (Count 6).  (Tr. 18.)  Defendant stated that trying these counts together "would unnecessarily confuse the jury for reasons that [Defendant] will hopefully point out to the Court" in a memorandum to follow.  (Tr. 18.)  Following the hearing, Defendant filed a letter with the Court stating that he would not be filing a memorandum in support of the motion to sever. (Ltr. at 1.)

The Government objects to Defendant's motion.  (Gov't's Consolidated Resp. at 12-13, ECF No. 41.)  The Government responds that (1) "[t]he evidence to be introduced at trial, including computer equipment, photographs of the home, and witness testimony . . ." relates to both the receipt and possession counts, and (2) the alleged offenses "all occurred in a single residence in Minneapolis, Minnesota during the fall of 2014, linking them in time and place."  (Gov't's Consolidated Resp. at 13.)  The Government also states that Defendant has not overcome the strong preference for joint

27

trials and has not provided any support for his motion.  (Gov't Consolidated Resp. at 13.)

"Defendant's conclusory, unsupported motion is insufficient to sustain his burden to demonstrate that severance is warranted" and could be denied on this basis alone. *United States v. Geddes*, No. 14-cr-394 (DWF/LIB), 2015 WL 671974, at *3 (D. Minn. Feb. 17, 2015).  In any event, the Court concludes that joinder of the six counts is proper under Rule 8(a) and severance is not warranted under Rule 14.

When ruling on a motion to sever, the court must "first determine whether joinder was proper under Rule 8 of the Federal Rules of Criminal Procedure."  *Reynolds*, 720 F.3d at 669.  Rule 8 provides that

> [t]he indictment . . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).   "In applying the same or similar character standard, [the Eighth Circuit] has found joinder of offenses to be proper when the two counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps."  *United States v. Garrett*, 648 F.3d 618, 625 (8th Cir. 2011) (quotation omitted).  "[Rule 8] is broadly construed in favor of joinder to promote the efficient administration of justice."  *United States v. Taken Alive*, 513 F.3d 899, 902 (8th Cir. 2008).

Here, all six counts are of the same or similar character "because they show [Defendant's] predisposition to abnormal sexual attraction."  *Reynolds*, 720 F.3d at 670

(finding "charges of enticing a minor to engage in illicit sexual activities, receiving child pornography, and production of child pornography" to be of the same or similar character). Similarly, the six counts also constitute a common scheme or plan: "[D]efendant's method of choice for fulfilling his abnormal sexual attraction was the Internet," namely, peer-to-peer file sharing.

The Government states that all of the offenses took place "during the fall of 2014." (Gov't's Consolidated Resp. at 13.) This is not accurate. The six counts span an approximately three-year period, from November 2011 through February 2015. (Indictment at 1-6.) Joinder has been found to be proper when the offenses are two years or nearly two years apart. *United States v. Rodgers*, 732 F.2d 625, 629 (8th Cir. 1984) (joinder proper when offenses were 20 months apart); *United States v. Hastings*, 577 F.2d 38, 40 (8th Cir. 1978) (offenses two years apart properly joined); *see United States v. Lindsey*, 782 F.2d 116, 117 (8th Cir. 1986) (per curiam) (offenses 17 months apart properly joined). "There is no per se rule on when the time period between similar offenses is so great that they may not be joined." *Rodgers*, 732 F.2d at 629. "The time period is relative to the similarity of the offenses, and the possible overlapping of evidence." *Id.* Here, evidence of the earlier offenses was uncovered as part of the investigation that took place in the last four months of 2014 and into the first two months of 2015. *See Lindsey*, 782 F.2d at 118 (offenses were of same or similar character when evidence "overlap[ped] somewhat" and second count was developed in course of investigation of first count). As the Government points out, the evidence for each of the counts will largely overlap, including the relevant computer equipment and witness

29

testimony.  Based on the foregoing, the Court concludes that the six counts have been properly joined under Rule 8(a).  *See Reynolds*, 720 F.3d at 670; *Lindsey*, 782 F.2d at 118; *Rodgers*, 732 F.2d at 629.

Nevertheless, "the [C]ourt ha[s] discretion to sever the counts if the joinder appear[s] to prejudice [Defendant] pursuant to Rule 14 of the Federal Rules of Criminal Procedure." *Reynolds*, 720 F.3d at 670; *see* Fed. R. Crim. P. 14(a) (permitting severance when the joinder of offenses "appears to prejudice a defendant"); *Garrett*, 648 F.3d at 625 ("Even if charges are properly joined under Rule 8 a district court may exercise its discretion and sever the charges if the defendant will be prejudiced by the joinder of the two charges.").  "There is a strong presumption against severing properly joined counts [and t]he defendant bears the burden of establishing prejudice." *Garrett*, 648 F.3d at 626 (quotation and citation omitted).  "A defendant cannot show prejudice when evidence of the joined offense would be properly admissible in a separate trial for the other crime." *Reynolds*, 720 F.3d at 670 (quotation omitted); *accord Garrett*, 648 F.3d at 626 ("[P]rejudice does not result if evidence of one charge would have been admissible in the trial of the other."); *Rodgers*, 732 F.2d at 630 ("Where evidence that a defendant had committed one crime would be probative and thus admissible at the defendant's separate trial for another crime, the defendant does not suffer any additional prejudice if the two crimes are tried together." (quotation omitted)).  Here, evidence of the six counts individually would likely be admissible in a separate trial on any particular count "to establish [Defendant's] method of intentionally using the Internet," namely, peer-to-peer file sharing, to obtain child pornography.  *Reynolds*, 720 F.2d at 670.

Because evidence related to the receipt counts (Counts 1 through 5) would likely be admissible in a separate trial on the possession count (Count 6) and Defendant has failed to offer anything other than a conclusory allegation of prejudice, the Court recommends that Defendant's Motion to Sever Counts (ECF No. 37) be denied. *See Geddes*, 2015 WL 671974, at *5; *see also Reynolds*, 720 F.3d at 670; *Garrett*, 648 F.3d at 626; *Taken Alive*, 513 F.3d at 903; *Rodgers*, 732 F.2d at 630.

[Continued on next page.]

## IV.

Based upon the foregoing, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 34) be **DENIED**.

2. Defendant's Motion to Suppress Statements, Admissions and Answers (ECF No. 36) be **DENIED**.

3. Defendant's Motion to Sever Counts (ECF No. 37) be **DENIED**.

4. Defendant's Motion to Dismiss Counts 1-5 (ECF No. 39) be **DENIED**.


Date: September_2_, 2015                           _____*s/ Tony N. Leung*_____
                                                  Tony N. Leung
                                                  United States Magistrate Judge
                                                  for the District of Minnesota

                                                  *United States v. Pearson*
                                                  File No. 15-cr-117(1) (JRT/TNL)


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.